MARIA ZAVALA, APPELLANT, V.
CONAGRA BEEF COMPANY, APPELLEE.
647 N.W.2d 656

Filed June 25, 2002. No. A-01-1083.

Lee S. Loudon, of Law Office of Lee S. Loudon, P.C., L.L.O., for appellant.

Shirley K. Williams and Joseph A. Wilkins, of Knudsen, Berkheimer, Richardson & Endacott, L.L.P., for appellee.

SIEVERS, CARLSON, and MOORE, Judges.

SIEVERS, Judge.

Maria Zavala petitioned for workers' compensation benefits for an on-the-job injury she sustained while working for ConAgra Beef Company (ConAgra). The Nebraska Workers' Compensa-

tion Court trial judge found that Zavala had sustained a 50-percent loss of earning capacity and awarded her a 2-percent permanent partial impairment status for her right upper extremity as well as vocational rehabilitation benefits. After Zavala's appeal to a review panel of the Workers' Compensation Court, the trial judge's award was affirmed in all respects except that the award of vocational rehabilitation was eliminated. Zavala appeals.

## FACTUAL BACKGROUND

Zavala came to the United States in 1984 and worked for several months doing assembly line work. She was then employed for 6 years in a factory putting together parts for airplanes. She first became employed by ConAgra at its Monfort plant in Grand Island, Nebraska, in November 1995, when she worked for 6 months in the deboning department. She subsequently left her employment at ConAgra and worked for a turkey company in Gibbon, Nebraska, and then returned to ConAgra's Monfort plant in July 1997. On October 18, 1999, Zavala reported that while working in her position as a head trimmer, she picked up a heavy cow's head to throw it in a basket. At that time, she felt pain in her neck and right shoulder.

Zavala's physician was Dr. Frank Lesiak, an orthopedic surgeon in Grand Island, who saw her for the first time on October 20, 1999. Zavala presented a chief complaint at that time of right shoulder and neck pain. After examination and a diagnostic workup, Dr. Lesiak diagnosed Zavala with narrowing of the C4-5 cervical disk area with encroachment of the neuroforamina and found that she had similar disease at the C3-4 level. He also diagnosed subscapular bursitis and myositis of the right shoulder.

Summarizing her medical treatment, we observe in the record that Zavala continued to see Dr. Lesiak, who imposed work restrictions on her and prescribed medication—first Vioxx and then Celebrex—and specialized physical therapy. By December 15, 1999, Dr. Lesiak felt that Zavala was at the point where a "Key Functional Assessment" should be done and that she should go back to a job that she could do given her diagnosis and limitations. The functional assessment was done, but it was considered to be "invalid" and not representative of her current physical capabilities because of "demonstrated inconsistencies,"

meaning, according to the examiner, that Zavala had attempted to manipulate the results. While there are extensive medical records in the evidence, it does not appear that the nature or extent of Zavala's medical treatment is in controversy, and therefore, we will not further detail that evidence.

By January 2000, Zavala had returned to work for ConAgra and initially was working at a job called "steam-vac," which involved vacuuming beef carcasses in an attempt to eliminate foreign objects such as hair or dust. Zavala had complained about her ability to do this job, saying that she was reaching too much, which caused problems in her shoulders and around her neck area. As a result, her job was changed after consultation with plant supervisory personnel. She was moved to a job that involved 4 hours of hanging tails and hearts and 4 hours of scraping tongues. The evidence revealed that part of the purpose of switching tasks within her workday was for her to use different muscles for different parts of her shift. Zavala was working a full 8-hour day in this task-switching position, which was a permanent job.

Dr. Lesiak ultimately rendered an opinion that Zavala had sustained permanent impairment of 5 percent to the cervical spine and 2 percent to the right upper extremity, but he concluded that these were not the results of separate injuries and were both caused by the incident of October 18, 1999.

Zavala's job with ConAgra ended as a result of an altercation with a coworker. In this incident, the coworker rubbed Zavala's posterior with a cow's tongue. Zavala threatened to report the coworker to the supervisor if he did not stop, but Zavala said he only laughed at her. While she claims she intended merely to hit him with her meathook, Zavala swung at him with the hand holding her knife. In any event, the coworker sustained a significant injury to his arm: A piece of flesh approximately 2½ by 2 inches was cut from his forearm, resulting in profuse bleeding. As a result of the incident, both Zavala and the coworker were fired.

During the approximately 4 months when Zavala was doing the job alternating between hanging tails and hearts and scraping tongues, she never missed work due to any injury, never saw a doctor, and never made ConAgra's management personnel, including the safety manager, aware that she was having any

trouble doing her job. After Zavala's termination of employment, she told a vocational rehabilitation counselor that she liked her job, and she did not indicate that she was unable to perform it at the time of her termination, although her trial testimony was to the contrary. Cory Mollak, a supervisor, testified that he spent a considerable amount of time on the plant floor and that whenever he saw Zavala, she seemed cheerful, never reported discomfort or had complaints, and, as far as he knew, could physically perform the job. Mollak also testified that between January 2000 and Zavala's termination of employment because of the altercation with the coworker, Zavala seemed happy working every time he observed her on the floor and was doing the work well without difficulty.

A vocational rehabilitation counselor, Gayle Hope, was appointed by the Workers' Compensation Court to make an assessment of Zavala's loss of earning capacity. Hope's extensive report is in evidence. ConAgra used Deborah Determan as its vocational rehabilitation counselor, and her extensive report is likewise in evidence. We shall detail the evidence concerning vocational rehabilitation and loss of earning capacity in the analysis section of our opinion.

## TRIAL COURT DECISION

The trial court found that on October 18, 1999, while engaged in her employment, Zavala injured her right shoulder and neck as a result of lifting a cow's head. As a consequence, the court found that she had sustained a 50-percent loss of earning capacity and a 2-percent permanent partial disability to her right arm. The trial judge made a specific finding that Zavala was unable to perform work for which she had previous training or experience and that therefore, she was entitled to vocational rehabilitation services. The trial judge recounted in some detail the medical evidence, including that dealing with causation. The trial judge also found that Zavala's employment was terminated following the incident of horseplay and the injury to a coworker. The court stated:

> It is the court's opinion [that] but for her termination, [Zavala] could have continued to perform the work of the position in which she was placed. Corey [sic] Mollak

testified to the demands of the job and they are well within the most conservative reading of [Zavala's] restrictions.

The trial judge rejected the contention that Zavala was permanently and totally disabled, citing the basic opinions of both Hope and Determan and finding that Hope's opinion that Zavala was limited to being an odd-lot worker had been rebutted. At least by implication, the trial judge was critical of the fact that Hope had "considered both [Zavala's] restrictions to the body as a whole and right upper extremity in formulating her opinion that [Zavala] is an odd-lot worker." For convenience, we shall refer to the combining of member and nonmember impairments to determine loss of earning capacity as "stacking."

The trial judge does not specifically opine whether stacking of injuries is legally permissible. However, the implication, including the reliance upon Determan's report criticizing Hope's methodology, suggests that the trial judge's position is that such stacking is improper. Nonetheless, the trial judge specifically found, in determining whether Hope's opinion had been rebutted, that the fact that Zavala "successfully worked for four months in a light duty position with [ConAgra] in and of itself shows that she is not an odd-lot worker." The trial judge concluded that Zavala had sustained a 50-percent loss of earning capacity, but she ordered vocational rehabilitation, specifically an "English as a Second Language" program. Zavala filed an application for review.

## REVIEW PANEL DECISION

Zavala's first assignment of error before the review panel of the Workers' Compensation Court was that the trial court erred in failing to combine the scheduled member impairment and the whole body injury so as to find her permanently and totally disabled. Indicating that any "philosophical inclination" on the review panel's part that the scheduled and unscheduled injuries could be combined would not supersede the Workers' Compensation Court's purely statutory authority, the review panel found that it could not deviate from the dictates of Neb. Rev. Stat. § 48-121(3) (Cum. Supp. 2000) because such statute was silent on the matter. The review panel concluded that without specific statutory authority from the Nebraska Unicameral, the Workers'

Compensation Court could not combine such injuries to determine permanent and total disability. The review panel rejected all of Zavala's assignments of error.

With respect to ConAgra's cross-appeal regarding vocational rehabilitation, the review panel noted that Zavala's employment was terminated because of the incident with the coworker rather than her inability to perform her assigned work. The review panel then noted the absence of any finding by the trial judge that vocational rehabilitation services were reasonably necessary to restore Zavala to suitable employment, such absence making it error as a matter of law to award vocational rehabilitation. Thus, that portion of the trial judge's decision was reversed.

Zavala timely perfected her appeal to this court.

## ASSIGNMENTS OF ERROR

Zavala assigns error to the reversal by the review panel of the award of vocational rehabilitation. Additionally, Zavala contends that the review panel committed error in failing to reverse the following four findings or decisions of the trial judge: (1) The scheduled member injury and the whole body injury could not be combined to determine loss of earning capacity; (2) the opinion of Hope, the court-appointed vocational rehabilitation counselor, had been rebutted; (3) Zavala was capable, within her restrictions, of performing the job at which she was working when her employment was terminated; and (4) Zavala was not an odd-lot worker. Lastly, Zavala asserts that the review panel erred in failing to reverse in light of the trial judge's failure to provide a reasoned decision for the finding that Zavala was working at a job within her restrictions at the time of her termination of employment.

## STANDARD OF REVIEW

A judgment, order, or award of the Workers' Compensation Court may be modified, reversed, or set aside only upon the grounds that the court acted without or in excess of its powers; the judgment, order, or award was procured by fraud; there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or the findings of fact by the compensation court do not support the order or award as

it exists. Neb. Rev. Stat. § 48-185 (Cum. Supp. 2000). As to questions of law, an appellate court in workers' compensation cases is obligated to make its own determinations. *Smart v. Scrivner/Food 4 Less*, 254 Neb. 111, 574 N.W.2d 505 (1998).

As the trier of fact, the Workers' Compensation Court is the sole judge of the credibility of witnesses and the weight to be given testimony. *Hale v. Vickers, Inc.*, 10 Neb. App. 627, 635 N.W.2d 458 (2001).

In testing the sufficiency of the evidence to support the findings of fact, the evidence must be considered in the light most favorable to the successful party, every controverted fact must be resolved in favor of the successful party, and the successful party will have the benefit of every inference that is reasonably deducible from the evidence. *Larson v. Hometown Communications, Inc.*, 248 Neb. 942, 540 N.W.2d 339 (1995).

## ANALYSIS

The court-appointed vocational rehabilitation counselor, Hope, concluded that Zavala had experienced "close to a 100% loss of access to the labor market in Nebraska." Hope also opined that if Zavala were to engage in training for English and job skills, she would experience an approximately 29-percent loss of wages, and it was Hope's opinion that after obtaining minimal skills in English and vocational services, Zavala would experience a loss of earning capacity of approximately 60 percent. Hope felt that without such vocational services and without learning to speak minimal English, Zavala, with her physical limitations, would be unable to find any employment in Grand Island and would therefore be an "odd lot worker in her present location [Grand Island] with her inability to speak English, being at the unskilled to semi-skilled level and being at the light work level."

Determan, ConAgra's rebuttal counselor, disagreed with Hope's conclusion on three specific grounds. The first was that Hope had failed to consider that Zavala's loss of her job at ConAgra was solely because she injured her coworker. Second, Determan said that Hope's analysis used the wrong average wage of $12.12 per hour when Zavala's actual base pay at the time of the injury was $9.25 per hour. Third, Determan said that

Hope's analysis "is inaccurate to the extent that the loss in earning capacity opinion is based on the combination of a scheduled and [an] unscheduled injury" and that as a result, the loss appeared greater than it actually was, as "only restrictions related to an unscheduled injury are considered in a loss in earning capacity analysis."

In Hope's report concluding that Zavala was an odd-lot worker, Hope recites, "**Impairment rating:** 4/18/00, 7%, whole body impairment by Dr. Lesiak." This is the medical predicate for Hope's opinion, but we are unable to find a report under such date from Dr. Lesiak. However, we do find a report from him dated May 11, 2000, assigning Zavala a "7% whole person impairment which is broken down as follows: 5% impairment to the cervical spine and 2% for the right upper extremity." We think that it is a fair assumption that it is this report Hope relied upon in formulating her opinions.

Zavala claims that the trial court erred in finding that scheduled member injuries could not be combined with whole body injuries for the purpose of determining loss of earning capacity. The trial judge said that she agreed "with [ConAgra] that [Hope's] opinion is rebutted. It appears that [Hope] considered both [Zavala's] restrictions to the body as a whole and right upper extremity in formulating her opinion that [Zavala] is an odd-lot worker." The trial court's decision could be read as a rejection of stacking. However, the trial judge's reasoning in the above-quoted paragraph continued: "Further, the court believes the fact that [Zavala] successfully worked for four months in a light duty position with [ConAgra] in and of itself shows that she is not an odd-lot worker." The trial judge's comment about stacking could be in the nature of dicta. But, the decision is not consistent with Workers' Comp. Ct. R. of Proc. 11 (2000), which requires clear and concise explanations of a trial judge's rationale. It is not clear whether the finding that Hope's opinion had been rebutted rests on a rejection of stacking, on a factual finding that Zavala is not an odd-lot worker, or on both.

■ The review panel clearly is of the view that stacking is presently impermissible. But, this court has held to the contrary in *Payzant v. Coufal Lumber Co.*, No. A-00-083, 2000 WL 1790027 (Neb. App. Dec. 5, 2000) (not designated for permanent

publication), *petition for further review overruled* 261 Neb. xxv (Feb. 22, 2001). We should have published that opinion which comprehensively discussed the stacking issue and found that stacking was permissible under Nebraska law. Thus, we repeat much of that discussion in this published opinion. In *Payzant*, the facts were on point with the instant case, as the defendant argued that an arm impairment and whole body impairment could not be combined or considered together to make up a case of total disability. ConAgra advances this same position, but no published authority from Nebraska is cited, other than the rule that when an employee suffers a scheduled injury the presence or absence of industrial disability is immaterial. See, *Fenster v. Clark Bros. Sanitation*, 235 Neb. 336, 455 N.W.2d 169 (1990); *Nordby v. Gould, Inc.*, 213 Neb. 372, 329 N.W.2d 118 (1983). The defendant in *Payzant* cited *Yager v. Bellco Midwest*, 236 Neb. 888, 464 N.W.2d 335 (1991), for the proposition that loss of earning capacity is relevant only to impairment of the body as a whole and placed heavy reliance upon *Providence Washington Ins. Co. v. Grant*, 693 P.2d 872 (Alaska 1985), which held that an employee must be compensated separately for foot, knee, and back injuries. The Alaska court stated:

> [A] double recovery [could result] if the loss of earning capacity resulting from the scheduled injuries were used to determine the employee's compensation for an unscheduled disability. To avoid this, when awarding the claimant for an unscheduled injury, the board must attempt to separate the loss of earning capacity resulting from scheduled disabilities from the loss of earning capacity resulting from the unscheduled injury.

*Id.* at 876.

 Nebraska's workers' compensation scheme is that a whole body impairment, or unscheduled disability, is compensated in terms of loss of employability and that scheduled injuries are compensated on the basis of loss of physical function. See, § 48-121; *Nordby, supra*. Often, to some extent, impairment of a member is also impairment of the whole body. However, § 48-121 draws what could be said to be an arbitrary classification by making the industrial impact of a scheduled injury immaterial. This same concept was well articulated by the

Supreme Court of Iowa in *Mortimer v. Fruehauf Corp.*, 502 N.W.2d 12 (Iowa 1993). The *Mortimer* court recognized, as is true in Nebraska, that functional disability is arrived at by determining the impairment of the employee's bodily function, thereby limiting disability to the loss of physiological capacity of the body part. In contrast, the *Mortimer* court pointed out that in cases of industrial disability, functional disability is only one factor, and that other factors such as age, education, experience, and the ability to engage in employment for which the employee is fitted are all measures used to determine the impairment of the ability to earn wages. In Nebraska, our approach is the same. See *White v. Christian Homes, Inc.*, 2 Neb. App. 213, 508 N.W.2d 309 (1993) (total disability means disablement to earn wages in same kind of work, or similar work, that worker was trained for or accustomed to perform, or any other kind of work which person of his or her attainments and mentality could do). The *Mortimer* court acknowledged that a person may suffer "a permanent total disability as a result of some scheduled injury. This may happen because of age, lack of training, or other condition peculiar to the person. Yet such an injury is *arbitrarily* compensable according to the schedule." 502 N.W.2d at 15.

*Mortimer* involved an injury requiring amputation of four toes of the employee's foot, which incident aggravated a preexisting depressive condition. The employer sought to limit compensation to that provided in the schedule for the loss of the toes. The court concluded that a psychological condition caused or aggravated by a scheduled injury should be compensated as an unscheduled injury. Its rationale included citation to the Iowa statute, equivalent to Nebraska's § 48-121, delineating payment for scheduled and unscheduled injuries:

> [The Iowa statute] sets no limitation as to the physical location of the injury causing the disability.
>
> The only limitation regarding location of the injury concerns permanent partial disabilities arising from scheduled injuries. And although such injuries may cause permanent total disability because of the claimant's lack of education or experience or physical strength or ability, the injuries are *arbitrarily* compensable according to the schedule. This is so because the legislature in its wisdom has seen fit to give

the commission no discretion with regard to scheduled injuries. The legislature did this in order to make certain the amount of compensation in cases of specific injuries and to avoid controversies. But where there is injury to a scheduled member *and also to parts of the body not included in this schedule*, there is no logical reason for such arbitrariness.

*Mortimer*, 502 N.W.2d at 17. These observations would seem equally applicable to § 48-121. Accordingly, the *Mortimer* court held that where there is injury to some scheduled member and also to parts of the body not included in the schedule, the resulting disability is compensated on the basis of an unscheduled injury. See, also, *Miller v. Lauridsen Foods, Inc.*, 525 N.W.2d 417 (Iowa 1994); *Evans v. Industrial Commission*, 19 Ariz. App. 90, 505 P.2d 258 (1973) (injuries to right knee and hip along with injury to lower back producing disabling pain moved employee's compensation from scheduled category to unscheduled category); *Boggs v. D & L Construction Company*, 71 N.M. 502, 379 P.2d 788 (1963) (holding that scheduled injury section of workers' compensation act is not exclusive where there is proof of separate and distinct impairment of other parts of body). Compare *Federal Compress & Warehouse Co. v. Risper*, 55 Ark. App. 300, 935 S.W.2d 279 (1996) (in case involving eye as well as cervical and thoracic spine injuries, court held that because eye injury was scheduled, it could not and should not have been considered when determining employee's wage-loss benefits).

We have been unable to find a published Nebraska case discussing stacking; however, the leading treatise in the area, 4 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 87.04 at 87-5 (2002), observes:

Although it is difficult to speak in terms of a majority rule on this point, because of significant differences in statutory background, it can be said that at one time the doctrine of exclusiveness of schedule allowances did dominate the field. But in recent years there has developed such a strong trend in the opposite direction that one might now, with equal justification, say that the field is dominated by the view that schedule allowances should not be deemed exclusive, whether the issue is treatment of a smaller member as a percentage loss of a larger, or treatment of any

scheduled loss as a partial or total disability of the body as a whole.

Admittedly, Larson's treatise suggests a position which is clearly contrary to the established Nebraska law, i.e., that industrial disability is immaterial when there is only a scheduled injury. The treatise points out that the employee's inability to get work is an indispensable ingredient in the concept of total disability and that "it is difficult to see why this factor is relevant in case of loss of a lung but not in case of loss of a leg." *Id.* at 87-6. To include consideration of employability in a case where there is only a scheduled injury would require amendment of § 48-121. But, Larson's view that the law is moving away from the exclusivity of scheduled compensation for member disabilities is worth noting. We believe that Nebraska has implicitly recognized stacking.

In *Barbaglia v. General Motors Acceptance Corp.*, 190 Neb. 529, 209 N.W.2d 353 (1973), the court affirmed a workers' compensation award of a 5-percent disability rating to the body as a whole as a result of a two-member injury to the claimant's legs and an additional 25-percent permanent and partial disability rating to the body as a whole due to crushing injuries to the claimant's chest and larynx. While the case proceeded on the claimant's argument that he should have been found totally disabled, the court nonetheless allowed stacking, in that after two scheduled leg injuries had been converted to a 5-percent permanent partial disability of the body as a whole, recovery was allowed for an additional 25-percent disability for the crushing injuries, which produced residual impairment of function of the larynx and chest.

In a more recent case, *Ideen v. American Signature Graphics,* 257 Neb. 82, 595 N.W.2d 233 (1999), the parties stipulated that the claimant had permanent impairment of her right arm, but she also claimed permanent damage to the muscles of her right shoulder and thoracic and cervical spine. While the compensation court awarded benefits for impairment of the right arm, no award was made for a whole body injury. The claimant retained a Dr. Gammel for impairment rating purposes, and he assigned her a 12-percent impairment of the upper right arm and a 5-percent impairment of the cervical spine, both of which ratings he then

combined to yield a 12-percent disability rating for the body as a whole. At the request of the defendant, the claimant saw a Dr. McCarthy, who gave her a 12-percent disability rating for her arm and nothing else.

The *Ideen* court recited the rule that the factual findings of the compensation court are not to be disturbed upon appeal unless they are clearly wrong, as well as the test from *Nordby v. Gould, Inc.*, 213 Neb. 372, 329 N.W.2d 118 (1983), that whether a disability is to a scheduled member or the body as a whole is dependent upon the location of the residual impairment, not the situs of the injury. While speaking in the nature of dicta, the court nonetheless said, "A review of the evidence in the case reveals that such evidence [from Drs. Gammel and McCarthy] would be sufficient to support a finding of either a scheduled member impairment alone or impairment to both the member and to the body as a whole." *Ideen*, 257 Neb. at 86, 595 N.W.2d at 236. If scheduled injuries and unscheduled injuries could not be considered together and stacked, then the Supreme Court's statement in *Ideen* quoted above would seem incorrect.

We observed in *Haake v. American Tool Cos.*, 8 Neb. App. 59, 588 N.W.2d 839 (1999), that it has long been established that the policy of liberal construction of the Nebraska Workers' Compensation Act is for the benefit of the claimant, citing *Osteen v. A. C. and S., Inc.*, 209 Neb. 282, 307 N.W.2d 514 (1981). That policy favors taking a view of § 48-121 that allows what is not directly prohibited, and there is no statutory prohibition against stacking a scheduled injury and an unscheduled injury to arrive at a true assessment of how the two injuries have impacted a claimant's employability—which is at the heart of understanding the concept of disability.

The Nebraska Workers' Compensation Act is of general interest—to employees, employers, and the public—and it should be construed so that technical refinements of interpretation do not defeat its purpose. See *Speas v. Boone County*, 119 Neb. 58, 227 N.W. 87 (1929). Its broad purpose is that when a personal injury is sustained by an employee, by accident or occupational disease, in the scope and course of employment, the "employee shall receive compensation therefor from his or her employer." Neb. Rev. Stat. § 48-101 (Reissue 1998). Stacking of

scheduled and unscheduled injuries serves that purpose by more fairly and accurately compensating injured workers.

Therefore, after considering the state of the law in other jurisdictions, the apparent approval of stacking by the Nebraska Supreme Court, the liberal interpretation to be accorded the Nebraska Workers' Compensation Act for the benefit of the claimant, and the absence of an express limitation in the act against stacking a scheduled injury and an unscheduled injury to form permanent total disability, we hold that Nebraska law does not prohibit consideration of the effect of a member injury when loss of earning capacity is assessed for a worker who also has sustained a whole body injury. But, we emphasize that the key to our conclusion herein is that the claimant, Zavala, has two separate areas of injury, arm and cervical spine, which are considered together to determine the extent of loss of earning capacity.

We should acknowledge the firmly established law that when an injury to a member results in an unusual or extraordinary condition of other members or other parts of the body, the claimant is entitled to compensation based on lost earning capacity under § 48-121(1) or (2). *Kraft v. Paul Reed Constr. & Supply*, 239 Neb. 257, 259, 475 N.W.2d 513, 515 (1991) (injured leg caused traumatic neurosis "as an 'extraordinary' reaction to the stress" of injury); *Burrious v. North Platte Packing Co.*, 182 Neb. 122, 153 N.W.2d 353 (1967). Therefore, we emphasize that this case falls into a different category: one work accident producing two injuries—one scheduled, one unscheduled. If the combination of the two injuries produces permanent total disability, see *Benish Kaufman v. Control Data*, 237 Neb. 224, 465 N.W.2d 727 (1991), then the Nebraska Workers' Compensation Act does not preclude such an award as a matter of law. And, if the member impairment adversely affects the worker such that loss of earning capacity from the unscheduled injury cannot be fairly and accurately assessed without considering the impact of a scheduled injury on the worker's employability, then stacking is permissible.

## RESOLUTION

Because the trial judge's view that stacking is impermissible under Nebraska law appears to have been part of the basis for

her finding that Hope's opinion that Zavala was an odd-lot worker had been rebutted, this matter must be reversed for consideration anew on the record already made of Hope's opinion in light of our holding that stacking of a member impairment with a whole body injury is permissible. This action is further necessitated because the trial judge's finding that Hope's opinion had been rebutted is not explained with a clear and concise rationale as required by rule 11.

Moreover, because in our view, the findings of both the trial judge and the review panel concerning Zavala's entitlement to vocational rehabilitation are inextricably intertwined with their positions that stacking is impermissible under Nebraska law, we reverse the decision of the review panel which eliminated the award of vocational rehabilitation and direct that the question of vocational rehabilitation be reconsidered by the trial judge on the record already made in light of our holding about stacking.

REVERSED AND REMANDED WITH DIRECTIONS.